## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

CARMEN D. DELGADO-BENÍTEZ,

     Plaintiff,

          v.                        CIVIL NO.: 10-2065 (MEL)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

## OPINION AND ORDER

### I.    PROCEDURAL POSTURE

Plaintiff Carmen D. Delgado-Benítez ("plaintiff" or "claimant") filed an application for disability insurance benefits on July 5, 2005, alleging disability beginning on January 1, 2001. (Tr. 125-133).[1]  Her application was denied initially, as well as on reconsideration. (Tr. 27-31). Plaintiff's timely request for a hearing before an Administrative Law Judge ("ALJ") was granted and scheduled for July 11, 2008. (Tr. 23).  Plaintiff attended the hearing represented by an attorney but declined to testify, requesting instead that the case be decided on the medical evidence of record. (Tr. 25).  On October 24, 2008, the ALJ issued a decision denying plaintiff's claim. (Tr. 10-22.) The Appeals Council denied plaintiff's request for review of the ALJ's decision on August 31, 2010; therefore, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner" or "defendant"). (Tr. 1-9.)

---

[1]Plaintiff's date last insured was December 31, 2006. (Tr. 10-22.)

On November 1, 2010, plaintiff filed a complaint in this case seeking review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), claiming that the ALJ's decision was not based on substantial evidence.  (Docket No. 1.)  On May 5, 2011, defendant filed both an answer and a certified transcript of the administrative record.  (Docket No. 13).  Both parties have submitted supporting memoranda.  (Docket Nos. 14, 15).

## II.   LEGAL STANDARDS

### A.  Standard of Review

Once the Commissioner has rendered his final determination on an application for disability benefits, a district court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing [that decision], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The court's review is limited to determining whether the ALJ employed the proper legal standards and whether his factual findings were grounded upon sufficient evidence.  Id.  Specifically, the court "must examine the record and uphold a final decision of the Commissioner denying benefits, unless the decision is based on a faulty legal thesis or factual error."  López-Vargas v. Comm'r of Soc. Sec., 518 F. Supp. 2d 333, 335 (D.P.R. 2007) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)).

Additionally, "[t]he findings of the Commissioner [ ] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The standard requires "'more than a mere scintilla of evidence but may be somewhat less than a preponderance' of the evidence."  Hernández-Guzmán

v. Astrue, Civil No. 08-2240, 2009 WL 3526485, at *2 (D.P.R. Oct. 23, 2009) (quoting Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971), cert. denied, 402 U.S. 976).

While the Commissioner's fact findings are conclusive when they are supported by substantial evidence, they are "not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam); Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)). Moreover, a determination of substantiality must be made based on the record as a whole. See Irlanda Ortiz, 955 F.2d at 769 (citing Rodríguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). However, "[i]t is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence." Id. Therefore, the court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

**B. Disability Under the Social Security Act**

To establish entitlement to disability benefits, the claimant bears the burden of proving that she is disabled within the meaning of the Social Security Act. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 146-47 (1987). An individual is deemed to be disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Claims for disability benefits are evaluated according a five-step sequential process. 20 C.F.R. § 404.1520; Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999); Yuckert, 482 U.S. at 140-42. Step one requires the ALJ to determine whether the claimant is working and thus engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, then disability benefits are denied. 20 C.F.R. § 404.1520(b). At step two, the ALJ determines whether the claimant has "a severe medically determinable physical or mental impairment" or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If she does, then the ALJ moves to step three to determine whether the claimant's impairment or impairments are equivalent to one of the impairments listed in 20 C.F.R part 404, subpart P, appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If so, then she is conclusively found to be disabled. 20 C.F.R. § 404.1520(d). If not, then the ALJ goes on to step four and assesses whether the claimant's impairment or impairments prevent her from doing the type of work she has done in the past. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant can perform her past relevant work despite her impairment(s), then disability benefits are denied. 20 C.F.R. § 404.1520(f). If the ALJ concludes that the claimant's impairment or impairments do prevent her from performing her past relevant work, the analysis then proceeds to step five. At this final step, the ALJ evaluates whether the claimant's residual functional capacity ("RFC"),[2] combined with her age, education, and work experience, allows her to perform any other work that is available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines that there is work in the national economy that the claimant can perform, then disability benefits are denied. 20 C.F.R. § 404.1520(g).

---

[2] An individual's residual functional capacity is the most that she can do in a work setting despite the limitations imposed by her mental and physical impairments. 20 C.F.R. § 404.1545(a)(1).

4

Under steps one through four, the plaintiff has the burden of proving that she cannot return to her former job because of her impairment or combination of impairments.  Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir.1989) (per curiam).  Once she has carried that burden, the Commissioner then has the burden under step five "to prove the existence of other jobs in the national economy that the plaintiff can perform." Id.

### III.   FACTUAL BACKGROUND

#### A.   Plaintiff's Background & Work History

Plaintiff was born in October of 1948, and was thus fifty-two years old at the time of the alleged disability onset in January of 2001. (Tr. 32).  She has a college education (Tr. 152), and worked as an interviewer for the Puerto Rico Department of Labor and Human Resources from July 1970 until December 2000.  (Tr. 33, 126.)  Plaintiff has been blind in her right eye since birth, due to complications during her delivery.  (Tr. 43, 50.)  In 1994, she had cataracts surgery in her left eye and had an intraocular lens implanted in that eye.  (Tr. 44; 50.)  Since the surgery, she has had 20/20 vision in her left eye, but states that her vision is not completely clear because she sees "black floaters."  (Tr. 46).  Also, she states that her left eye has been more sensitive since the surgery and she needs to take special care to avoid any accidents or damage to that eye.  (Tr. 44.)

On September 5, 2000, plaintiff sent a letter to her supervisor requesting early retirement because she had reached thirty years of service and was fifty-one years old.  (Tr. 50.)  In that letter, she also mentioned the vision problems described above.  (Tr. 50.)  The record does not indicate whether or not her request for early retirement was granted.  Plaintiff stopped working in December of 2000 because she states that she was required to use a computer, which affected her good eye, plus her vision was decreasing in her left eye due to pre-glaucoma.  (Tr. 33, 129.)

5

The function report form that plaintiff completed on August 12, 2005, when she applied for disability benefits, indicates that she is able to perform nearly all of the necessary functions for her activities of daily living, except that some functions are slightly limited by the lack of vision in her right eye, her need to protect her sensitive left eye, and lower back pain caused by renal deficiency. (Tr. 36-49.)  On an average day, plaintiff states that she wakes up early, takes care of her personal hygiene, runs errands, does basic housework, watches television and listens to music. (Tr. 36.)  She has to modify some of her cooking and performance of certain household chores that could expose her left eye to damage; for example, she only uses the back burners of the stove to avoid the risk of oil splashing her eye, and she seeks the assistance of friends for cleaning the windows and ceiling fans. (Tr. 38, 43.)  She states that she has had these limitations ever since the left eye surgery that was performed in 1994. (Tr. 41-44.)  She further indicates that she avoids driving due the lack of vision in her right eye and that, in fact, she has never driven a car or ridden a bicycle for this reason. (Tr. 39.)[3]  Plaintiff also states that she does certain things like bending, kneeling, or lifting heavy objects more slowly than she used to because the renal insufficiency causes her lower back pain. (Tr. 41.)  However, she did not indicate when these problems began.

In an undated disability function report completed subsequent to the August 12, 2005 report, plaintiff indicates that, in addition the conditions listed in the first report, she developed a heel spur in her right leg in or about January of 2006. (Tr. 179.)  No further changes in her conditions or their severity were noted.

**B.     Medical Evidence Contained in the Record**

The certified administrative record contains, *inter alia*, the following medical evidence

---

[3] However, one progress note from her opthalmologist, dated June 7, 2005, states that patient "came driving" to the appointment.  (Tr. 56; 211.)

regarding plaintiff's physical conditions:

Plaintiff submitted medical records from her various treating physicians, consisting of treatment records, progress notes, and laboratory test results and accompanying impressions. She did not submit any evaluations or other opinion evidence from any of her treating sources. There is one evaluation from a consulting internist, Dr. José M. Torres Ramos ("Dr. Torres"), who examined plaintiff on November 2, 2005. Additionally, three different State Agency medical experts reviewed plaintiff's file and rendered RFC assessments and disability evaluations.

### 1.    Visual impairments:

Plaintiff has been treated at the Eyes and Skin Institute ("Instituto de Ojos y Piel") for vision problems in her left eye since 1994. (Tr. 180, 202-08, 210-26, 243, 254-56.) On November 22, 1994 she had surgery at the Institute on her left eye for cataract phacoemulsification and the insertion of a lens implant. (Tr. 202-04). The records confirm that plaintiff has one blind, hypotensive eye and preglaucoma in the other eye. However, Dr. Nayda Vega, from the Eyes and Skin Institute, consistently noted that the blind hypotensive eye was not painful, and that claimant's left eye was in good working order with 20/20 vision, when corrected. (Tr. 206.) Plaintiff was advised to wear protective eye wear and continue with follow up care. (Tr. 207, 256.) She was also prescribed moisturizing eye drops to treat any irritation or discomfort. (Tr. 69, 152.) The record shows that plaintiff continued to be treated at the Institute through the end of the insured period and as late as January 2007. The latest progress notes during the insured period, dated July 18, 2005, show that her left eye vision was still 20/20. (Tr. 210.) Additionally, a visual fields exam done on the left eye

on June 7, 2005 showed the eye to be normal and reliable with no defects. (Tr. 206).[4]

The Institute's diagnosis of the plaintiff is consistent Dr. Torres's evaluation on November 10, 2005.  The consulting internist observed thinning of the arteries of the eye, left-eye glaucoma since 2005, and right eye blindness.  (Tr. 230).

### 2.      Osteoporosis

Plaintiff was first diagnosed with osteoporosis on July 31, 2002. (Tr. 329).  A July 31, 2002 CT scan of the claimant's right hip showed signs of mild osteoporosis, but no traumatic or arthritic pathology. (Tr. 329).  A CT scan of plaintiff's right foot, performed on July 6, 2005, showed signs of mild osteoporosis, as well as a large plantar calcaneal spur, degenerative changes along the dorsal aspect of the tarsal bones and a spur arising from the inferior aspect of the tarsal bone.  (Tr. 209.) No other abnormalities were noted. (Tr. 209).

Dr. Torres, the consulting expert, referred plaintiff for a left elbow x-ray on November 4, 2005.  (Tr. 229.)  The radiologist's impression was that plaintiff suffered from mild to moderate osteoarthritis. (Tr. 229.)

### 3.      Renal Insufficiency and High Blood Pressure

Plaintiff has been a patient of Dr. Osiris Larregoity, an internist and nephrologist, since 1997. (Tr. 347.)  He wrote a note certifying that plaintiff is "severely hypertensive" and suffers from "chronic renal insufficiency and proneness to severe fluid retention and edema." (Tr. 347).  He states that she is treated with a combination of diuretics, which cause her to urinate often, usually on an hourly basis.  (Tr. 347.)  There are also numerous laboratory reports, including urinalysis and blood

---

[4] Records from October 2006 and July 2007, outside the insured period, show that plaintiff had developed after-cataract, obscuring her vision, and nuclear sclerosis; however, her left eye vision was still 20/20.  (Tr. 263-66.)  She was advised to monitor her condition and seek follow up if there was no improvement.  (Tr. 266.)

analysis, apparently documenting plaintiff's renal insufficiency. (Tr. 267-348).  His progress notes spanning from 2001 to 2007 report that the claimant had minimal edema in 2003 (Tr. 311), which became more persistent in December 2005. (Tr. 296).  Dr. Larregoity also kept a steady log of the plaintiff's blood pressure ranging from 130/80 to 160/100. **(**Tr. 267-341). He noted that a low sodium diet and compliance with medication helped improve claimant's condition. (Tr. 197, 286, 296).  Additionally, he prescribed Allopurinol to control uric acid. (Tr. 152).

Dr. Torres's report notes that plaintiff has been suffering from renal insufficiency since 1996. (Tr. 230).   He further estimates that plaintiff suffers from hypertension, hyperuricemia, liver insufficiency and hyperkalemia. (Tr. 231)**.**  He noted no heart conditions (Tr. 232-234), which is confirmed by   chest x-rays from November 2005 and July 2006 showing no heart or lung abnormalities.  (Tr. 229; 290.)

### 4.    Additional complaints

Plaintiff's weight is recorded by all of her physicians as being between 230 pounds and 250 pounds throughout the relevant period. Though both her treating physicians and non-treating physicians find her to be obese, she has sought no treatment for her obesity.

Plaintiff submitted medical evidence dated after the insured period from Dr. Florencio Lao Sam, a physiatrist and rehabilitation doctor.  (Tr. 369-73.)  On May 26, 2008, Dr. Lao Sam diagnosed plaintiff with severe bilateral radiculopathy, lumbar and cervical, and carpal tunnel syndrome.  (Tr. 370.)  He states that she has a "history of  severe chronic cervical pain radiating to both upper and extremities with severe chronic progressive weakness, numbness, cramps and pain at both upper extremities and both hands since several years ago with acute exacerbation several weeks ago."  (Tr. 369.)  He also states that plaintiff reports severe pain in her left knee and heel

"since several months ago.  (Tr. 369.)  He opined that plaintiff cannot grasp or handle heavy objects, perform repetitive movements, twist, bend, or stoop, nor can she lift or carry light objects; she cannot sit, stand, or walk for long periods of time; and cannot squat, crawl, or climb stairs.  (Tr. 369.)  The radiologist's impressions from x-rays performed on May 20, 2008, indicate mild paravertebral muscle spasm with discogenic disease at two of the cervical vertebrae, mild scoliosis, and compression fracture at the T12 level.  (Tr. 371-72.)  Dr. Lao sam prescribed physical therapy three times a week, Clinoril, massage and gentle range of motion exercise.  (Tr. 364-366).

### 5.    The Consulting Expert's Report

Dr. Torres Ramos' medical evaluation of November 10, 2005 states that plaintiff "is able to sit one hour, stand ten minutes, walk fifteen minutes, handle objects, lift and carry two gallons of water, hear, speak and travel with [a] friend." (Tr. 230).  Although he notes that  plaintiff has pain in the left elbow and swelling of the legs, he found her "well nourished, well developed, obese, in no acute distress, [and] cooperative." (Tr. 230).  He did, however, note that plaintiff had motor loss in her legs resulting in 4/5 strength.  (Tr. 231.)  He also noted slight range of motion limitations in the following areas: forward hip flexion, 60 degrees out of 100; interior and exterior leg rotation, 35 out of 40 and 40 out of 50 degrees, respectively; lateral lumbar spine flexion, 25 out of thirty degrees; and cervical spine flexion and lateral flexion, 40 out of 45 degrees.  (Tr. 240.)

### 6.    State Agency Expert's Opinions

Dr. Vicente Sánchez completed a physical RFC assessment on January 17, 2006.  (Tr. 244-51.)  On that same date, Dr. Sánchez issued a case evaluation concluding that plaintiff's conditions do not meet the or equal the level of any of the conditions listed in 20 C.F.R part 404, subpart P, appendix 1.  (Tr .252.)  The RFC analysis indicated that plaintiff could occasionally lift 20 pounds,

frequently lift 10 pounds, and had unlimited pushing and pulling abilities.  (Tr. 245.)  He also opined that plaintiff could stand and/or walk for about 6 hours in an 8 hour work day and sit for about 6 hours in an 8 hour work day.  (Tr. 245.)  He further concluded that she had no postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 246-47.)

Dr. María E. Lorente completed a physical RFC assessment and a case analysis on September 25, 2007.  (Tr. 350-58.)  In her RFC assessment, she affirmed Dr. Sánchez's findings of January 17, 2006.  (Tr. 350-58.)  She noted that plaintiff has a history of obesity, osteoporosis, renal insufficiency, and an opthalmological condition.  (Tr. 358.)  She observed that plaintiff's conditions were stable and that her vision, with correction, was stable at 20/20.  (Tr. 358.)[5]

## IV.   THE ALJ'S FINDINGS

After evaluating the evidence on record, the ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.

2.   The claimant has not engaged in substantial gainful activity since January 1, 2001, the alleged onset date.

3.   The claimant has the following severe impairments: osteoarthosis and allied disorders, obesity, and other hyperalimentation.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

5. Through the date last insured, the claimant had the residual functional capacity to perform the full range of light work as defined in 20 CFR § 404.1567(b). The claimant has no postural,

---

[5]A third case analysis, by state agency Dr. Israel González, dated September 26, 2007, simply states "see RFC." (Tr. 359.)

visual, manipulative, communicative, or environmental limitations.

6.  The claimant is capable of performing past relevant work as an interviewer.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7.  The claimant has not been under a "disability," as defined in the Social Security Act, from January 1, 2001 through December 31, 2006.  (Tr. 34-38.)

## V.   LEGAL ANALYSIS

The findings of the Commissioner reflect an application of step four of the sequential evaluation process, in which the plaintiff must demonstrate that she can no longer perform her former work due to her impairment(s).  See 20 C.F.R. § 404.1520(e); Manso-Pizarro, 76 F.3d at 17. In denying plaintiff's claim under this step, the ALJ first determined that plaintiff has:

> The residual functional capacity  for light work (lift and carry 10 pounds frequently, and 20 pounds occasionally). She is able to sit, stand and/or walk for 6 hours in an 8-hour workday. She is not limited in pushing and or pulling (including the operation of hand and/or foot controls) with her upper and lower extremities. She has no postural, visual, communicative, or environmental limitations.

 (Tr. 21.)  Based on this finding, the ALJ compared plaintiff's RFC with the physical demands of her past relevant work as an interviewer, and concluded that she was capable of performing that work. (Tr. 22.)

Plaintiff argues that she is incapable of performing past relevant work and that the ALJ's findings regarding her physical capabilities were not based on substantial evidence.  (Docket No. 14, pp. 2, 6, 8, 10-11).  In so contending, she raises a wide variety of objections: 1) that the opinion fails to properly consider the treating physicians' opinions, 2) that the ALJ discounted medical findings from after the date last insured, 3) the ALJ failed to discuss the side effects from the claimant's

medication and how they affected her work, iv) the ALJ failed to provide a specific rationale for the rejection of the claimant's testimony, v) the ALJ failed to recognize the claimant's attempt to obtain pain relief in its analysis of the claimant's credibility, vi) the ALJ failed to comply with SSR 96-7p by completely ignoring various witness statements in the record describing the claimant's limitations, and vii) the ALJ failed to obtain vocational expert testimony .  (Docket No. 14, pp. 4-9.) As defendant correctly points out, many of claimant's objections are undeveloped, consisting merely of citation to a legal standard and a bare assertion that the ALJ failed to comply with said standard, without citing any specific evidence from the record.  Nevertheless, the court will address each of plaintiff's contentions in turn.

### A.      Consideration of Treating Source Opinions; Post-Coverage Period Evidence

Plaintiff argues that the ALJ erred in placing "all of his weight in [sic] non-examining DDS [Disability Determination Services] opinions as to severity and RFCA," and that there was "no consideration of Treating Source opinions."  (Docket No. 14, p. 4.)  She also alleges that the state agency findings were "five years prior [to the date last insured]."  (Docket No. 1, p. 5.)  The ALJ effectively gave controlling weight to the state agency physicians opinions, but he had valid reasons for doing so.  There are no treating source opinions in the record dated prior to the last date insured, and the circumstances of plaintiff's case do not warrant consideration of post-coverage evidence. Additionally, her assertion about the date of the state agency findings is incorrect.

Generally, an ALJ should give "more weight to the opinions from the claimant's treating physicians, because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments."  20 C.F.R. § 404.1527(d)(2). The ALJ will "give controlling weight to the opinions of treating physicians if well-supported by

medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record." Id.  On the other hand, the ALJ may give greater weight to the opinion of a State agency physician if that opinion is based on a review of a complete case record and is consistent with and supported by the preponderance of medical and other evidence in the record.  Social Security Ruling 96-6p, 1996 WL 374180, at *3.  Therefore, under the right circumstances state agency physician opinions may constitute the substantial evidence needed to support the ALJ's findings.  See Rodríguez v. Secy' of Health & Human Servs., 647 F.2d 218, 223 (1st Cir. 1981)

The regulations define medical opinions as "statements from physicians . . . or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2).  Generally, medical expert opinions are required to the ALJ to determine the extent to which a claimant's medical conditions limit her ability to perform work-related activities.  In order to evaluate a claimant's RFC an ALJ cannot rely on raw medical data; rather, he must look to physician's opinions to translate that evidence into functional terms.  See Vega Valentín v. Astrue, 725 F. Supp. 2d 264, 271 (D.P.R. 2010) (citing Berríos López v. Sec'y of Health & Human Servs., 951 F.2d 427, 430 (1st Cir. 1991) (per curiam); Rosado v. Sec'y of Health & Human Servs., 807 F.2d 292, 293 (1st Cir. 1986)).  The medical evidence of record prior to the last date insured consists of progress notes and treatment records that do not include any judgments about plaintiff's physical restrictions or what she can do despite her impairments.  For example, the records from the Eyes and Skin Institute only state plaintiff's diagnosis, her medical history, and that she was provided eye drops as treatment and

advised to protect her left eye.  They do not indicate the extent to which the condition of plaintiff's eyes limits her ability to function, if at all.  These records, therefore, do not constitute medical opinions, and the ALJ was thus not required to give them controlling weight.

The only evidence from plaintiff's treating sources that could be classified as a "medical opinion" under this definition is the evaluation by Dr. Lao Sam which is from May 2008, more than a year after plaintiff's last date insured of December 31, 2006.  To qualify for Social Security disability benefits, a claimant has the burden to show that she was disabled during the coverage period, which is the time period between the alleged disability onset date and the date last insured. See 42 U.S.C. § 416(i); Alcaide v. Sec'y of Health & Human Servs., 601 F. Supp. 669, 672 (D.P.R. 1985); Sampson v. Califano, 551 F.2d 881, 882 (1st Cir. 1977).  While courts have reached different conclusions as to whether post-coverage medical evidence should weigh in determining if a condition was disabling during the coverage period, see id. at 672-73 (collecting cases), the First Circuit has held that "[m]edical evidence generated after a claimant's insured status expires may be considered for what light (if any) it sheds on the question [of] whether the claimant's impairment reached disabling severity before his insurance status expired."  Padilla Pérez v. Sec'y of Health & Human Servs., 985 F.2d 552, *5 (1st Cir. 1993) (unpublished); (citing Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 81 (1st Cir. 1982); Alcaide, 601 F. Supp. at 672-73).[1]

Dr. Lao Sam's opinion, rendered a year and a half after the last date insured, does not serve

---

[1] For example, in Deblois, post-coverage medical evidence established that plaintiff had a serious mental condition; however, the record lacked any adequate medical evidence of his mental condition prior to his last date insured of March 31, 1972.  686 F.2d at 78.  Because plaintiff had been injured in the Vietnam War in 1969, the ALJ noted that his mental condition may have been war-related.  Id. at 79.  However, although he referred plaintiff for further psychological examinations after the hearing, he did not ask the medical experts to express an opinion as to whether plaintiff's disability had commenced as a result of the 1969 injury, and thus prior to March 31, 1972.  Id. at 81. Because plaintiff had appeared pro se and with a reduced mental capacity, the First Circuit held that "the ALJ had a duty, which ha[d] not adequately been discharged, to develop the record of the etiology of the illness."  Id.

this purpose.  To begin with, Dr. Lao Sam's opinion is inconsistent with the medical evidence of record from the insured period.  His finding that plaintiff cannot grasp or handle heavy objects nor lift or carry any objects at all (Tr. 369) is inconsistent with the November 2005 opinion of Dr. Torres, the examining consulting physician, that plaintiff can handle all objects and lift an carry two gallons of water.  (Tr. 230.)  These findings, and Dr. Lao Sam's further findings that plaintiff cannot squat, crawl, or climb stairs, are also inconsistent with the range of motion chart that Dr. Torres completed, indicating only slight limitations in certain areas.  (Tr. 240.)  The most serious limitation he observed was that plaintiff's forward hip flexion limitation was limited to 60 degrees out of 100, which would suggest that she can only partially squat and bend over, but not that she cannot squat at all. Additionally, Dr. Lao Sam's statement that plaintiff has had severe chronic cervical pain "since several years ago" is vague and is also inconsistent with the lack of any evidence that plaintiff sought treatment for cervical pain prior to seeing Dr. Lao Sam in 2008.  Moreover, Dr. Lao Sam does not explain the basis for his conclusion that the pain began several years ago, which is problematic considering that the evaluation does not indicate that he ever examined her prior to 2008.[1] Therefore, despite the fact that Dr. Lao Sam's evaluation mentions that plaintiff had suffered from the conditions he diagnosed "since several years ago," it does not clearly refer to plaintiff's condition during the coverage period, that is, prior to December 31, 2006.  Therefore, the ALJ was not required to weigh Dr. Lao Sam's opinion in his analysis of whether plaintiff was disabled during the coverage period.

The ALJ did not err in basing his decision on the opinions of the state agency physicians. As he explained, their opinions were based on a review of plaintiff's complete medical record,

---

[1] An undated disability report that plaintiff completed after her initial application was denied indicates that her first visit to Dr. Lao Sam was on November 16, 2007.  (Tr. 196.)

confirmed by the fact that the evaluations accurately list all of plaintiff's diagnoses, indicating that all of her conditions were considered.  (See Tr. 245, 351.)  Further, he noted that the state agency expert's opinions were consistent with "clinical notes and reports from treating sources, the conservative nature of her treatment, daily activities and functioning, the statements and assessments from evaluating and non-examining sources and the rest of the evidence in record." (Tr. 21). Contrary to plaintiff's assertion, the two state agency RFC assessments and case analyses were not dated "five years prior" to the last date insured of December 31, 2006.  The first one is dated January 17, 2006, eleven months prior to the last date insured (Tr. 250-51), and the second one is dated September 25, 2007, several months after her insured status expired, though it indicates that the RFC refers to plaintiff's condition December 31, 2006.  (Tr. 357-58.)  Therefore, it was permissible for the ALJ to rely on the state agency opinions in reaching his decision, especially considering that they were the only medical opinions in the record regarding plaintiff's condition during the coverage period.

**B.      Rejection of Plaintiff's Testimony**

Plaintiff claims that the ALJ merely summarized her testimony, but did not provide a specific rationale for rejecting it, as required by Social Security Ruling 96-7p.  As an initial matter, plaintiff did not provide any testimony the hearing because she waived her right to do so, requesting that the ALJ render his decision based on the medical evidence of record.  (Tr. 25.)  Therefore, the only statements that the ALJ had to evaluate were those in plaintiff's application for disability benefits and those that she made to Social Security agency representatives when interviewed in connection with her application, as recorded in the various disability reports in the record.  (Tr. 32-35, 36-49, 125-33, 147-72, 175-84).  According to the application and these reports, plaintiff claims that she

17

cannot work because she had to use a computer and because pre-glaucoma in her left eye made her vision worse. (Tr. 148.) She also states that she has lower back pain due to her renal deficiency that limits her bending, kneeling, and lifting heavy objects (Tr. 41); however, she also indicates that her past relevant work did not require her to stoop, kneel, crouch, or lift or handle heavy objects. (Tr. 149.)

Social Security Ruling 96-7p explains how the adjudicator should evaluate subjective claims about the limiting effects of pain or other symptoms on an individual's functional capacity. See SSR 9507p, 1996 WL 374186 (S.S.A.). It requires the ALJ to make a specific finding about the credibility of such statements. Id. at 1. This finding must be based on a consideration of all the evidence in the case record including, but not limited to, medical signs and laboratory findings; diagnosis, prognosis, and medical opinions by treating or examining physicians; and statements from the claimant, the claimant's physicians, or other individuals about the effects of the symptoms on the claimant's daily activities and work or efforts to work. Id. at 5. Here, the ALJ made a specific finding that plaintiff's statements about the "intensity, persistence and limiting effects" of her symptoms were inconsistent with the other record evidence, which consisted of medical records from treating physicians, one examining consultant opinion, and two state agency non-examining opinions. (Tr. 20.) Regarding her alleged disabling high blood pressure, the ALJ noted that plaintiff's treating doctor prescribed her medications that improved her condition and that his records show almost normal blood pressure readings. (Tr. 20.) With respect to her alleged visual impairment, the ALJ noted that records from the Eyes and Skin Institute consistently show that her left eye is functional, with 20/20 vision when corrected. (Tr. 20.) Moreover, the record shows that plaintiff's left eye sensitivity began in 1994 and she has been treated for hypertension and renal

insufficiency since 1996.  Plaintiff continued to work with these conditions for six and four years,

respectively, until she ceased working in January 2000.  There is no indication–or allegation–that

her conditions progressively worsened during that time.  The fact that plaintiff continued to work

for several years with the same conditions that she now alleges prevent her from doing any gainful

activity casts doubt upon her claim of disability.

### C.   Attempts to Obtain Pain Relief; Side Effects of Medications; Witness Statements; Failure to Obtain Vocational Expert Testimony

Plaintiff claims that the ALJ erred by failing to consider her persistent efforts to obtain pain

relief in his evaluation of her credibility. (Docket 14, p.6). In support of this allegation plaintiff

merely cites SSR 96-7p; she does not cite to any record evidence showing that she made persistent

efforts to obtain pain relief.  (Docket 14, p. 6).  To the contrary, although her application for

disability benefits in 2005 states that she has lower back pain, the only record evidence showing that

she sought treatment for this symptom is the visit to Dr. Lao Sam.  That report is dated May 2008.

(Tr. 370.)  In a disability report form, plaintiff indicated that her first visit to Dr. Lao Sam was in

November 2007.  (Tr. 196.)  Both dates are after the last date insured, and neither represent a

"persistent effort" to obtain pain relief.  Moreover, in the list of medications that plaintiff provided

for the various disability report forms, no pain medications are included.  (Tr. 152, 181, 197.)

Finally, although plaintiff alleges that her lower back pain is caused by her renal insufficiency, her

nephronologist, Dr. Larregoity, does not mention complaints of pain anywhere in the records he

submitted.

Plaintiff further claims that the ALJ failed to consider, "the side effects from the claimant's

many medications on his/her ability to work." (Docket No. 14, p. 5.)  However, plaintiff did not

19

indicate that her medications caused any side effects.  She listed the medications that she takes in three different disability reports in the record.  (Tr. 152, 181, 197.)  The medications are to control her blood pressure and uric acid and to soothe her dry left eye.  Id.  In the column labeled "side effects you have" plaintiff stated "none" next to each medication.  Id.  Therefore, this contention is clearly unfounded.

Additionally, plaintiff contends that the ALJ "totally ignor[ed] various witness statements in the record describing the claimant's limitations," contrary to SSR 96-7p, which requires the ALJ to "consider statements from other persons about the symptoms and how they affect the individual." (Docket No. 14, p. 7.)  Again, plaintiff's allegation is unfounded because there are no witness statements in the record.

Finally, plaintiff argues that the ALJ erred in failing to enlist the assistance of a vocational expert for four different reasons: 1) "the presence of significant nonexertional limitations," 2) "the ALJ's finding that claimant suffers from a severe mental impairment," 3) "the ALJ's finding that the claimant was limited to a 'low-stress' job," and 4) "the ALJ's finding that the claimant requires a sit/stand option."  (Docket No. 14, p. 8-9.)  The requirement that an ALJ use vocational expert testimony applies at step five of the disability analysis, where it is the Commissioner's burden to show that there are other jobs in the national economy that the claimant can perform.  See Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989) (finding that when a claimant's non-exertional limitations limit the ability to perform a full range of jobs, the Commissioner must carry his burden "typically through the use of a vocational expert").  Here, however, the ALJ found that plaintiff was able to perform her past relevant work and thus ended his analysis at step four. Furthermore, the ALJ did not make any of the findings that plaintiff mentions.  Indeed, it is difficult

to fathom why plaintiff even mentions a finding of a severe mental impairment, as she herself does not even allege a mental impairment.  As such, plaintiff's final objection to the ALJ's decision must be discarded.

## V.   CONCLUSION

Based on the foregoing, it is hereby concluded that the Commissioner's decision was based on substantial evidence. Therefore, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

In San Juan, Puerto Rico this 30th day of March, 2012

s/Marcos E. López
U.S. Magistrate Judge